Before we move to the cases to be heard this morning, we have a motion for admission to the bar of this court. The movement is our colleague Judge Lynn. Judge Lynn. Thank you, Judge Bryson. I would like to move the admission of Stanley Fisher, who is a member of the Bar and Good Standing of the Highest Court of Virginia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Mr. Fisher, the motion is granted and you are admitted to the bar. I would invite you to step over to the clerk's station and take the oath. Before you do, I would like to extend to you a warm welcome on behalf of all the judges to the bar of this court. Ms. Redman, do you solemnly swear or affirm that you will support yourself as an attorney and counselor above this court, uprightly and according to law, and that you will support the Constitution of the United States of America? Well, I add my welcome. I know Mr. Fisher quite well, since he has served as my law clerk for the past year and a half and has made a substantial contribution to the work of my chambers, to the work of this court. I'm very proud of what you've done. You've accomplished quite a bit. I look forward to your continuing successful legal career and we expect to see you at the lectern shortly. Welcome. Thank you. We have five cases on for disposition today. Three of them will be argued this morning. Two of them will be submitted on the briefs. Before we begin, just for the purposes of telling counsel, in case you're not familiar with the blighting system, that when the yellow light goes on, it means you're beginning to consume your rebuttal time. When the red light goes on, that means your time has expired. In addition, we have, I assure you, read the briefs. We're familiar with the case. We're familiar with the arguments. So please, the time is limited and do get right to the issues you want to call to our attention today. We don't need to have a lengthy exposition of the facts because we will be familiar with the case. Very well. Let's begin with the first case, number 05-1354, Flex Rest against Steele case. Mr. Sees. Is that the pronunciation of your name? Sees. Sees. Sees. All right. Very well, Mr. Sees. May it please the court, this is an appeal from a jury patent case tried in the Western District. Judge McKeith, the judge, now has six circuit court appeals. In this case, the 489 patent was held invalid by the jury. The primary issue involved in the case, particularly because of a stipulation the parties entered into in the middle of the case, where they said Steele case's products infringe, and in return for that we said the KBS reads on the claims and therefore the claims are invalid if the KBS is prior art. The rest of the case was tried upon that premise. Our primary contention here on this appeal is that the so-called KBS, which was a prior device made by Steele case, and there's no doubt about that, but that it is simply not prior art. It was wrong for it to ever show its face in the courtroom, and it was wrong for it to be before the jury, and it was wrong to not instruct the jury on the issue of suppression and concealment so that they never had that opportunity to even consider whether the KBS, which admittedly was secret, was in fact not prior art because it went off to G2. The activities of Steele case show, and there's a timeline in our brief on page 9, that they reduced the practice, this so-called KBS, in about November 16th, 1990, and there's laboratory test reports of that. Now that is before our client conceived in Thanksgiving 1990. The dates are quite close, and the evidence at the trial showed, and every single witness of Steele case so testified that it was their objective and that it was their conduct to keep that KBS secret from the time they first had it reduced to practice until when? Until why? Until the so-called Neocon Furniture Show occurred in June of 1991 in Chicago. There were three primary witnesses on this subject at the trial, Mr. Bruce Preston, the technical manager of services, the inventor of the KBS device, they got their own patent on their device, Mr. George, and Mr. Musculus, who did the product testing in the testing laboratories in Grand Rapids for Steele case. And each of those people testified that they understood that they were keeping it secret and that there was to be no revealing of the product until the Neocon show. What do you think your strongest case is in our precedent for demonstrating that comparable facts are sufficient to constitute concealment? I think the strongest cases that I have are the Young v. Dvorkin case and the Lutzka. I hope I pronounced that right. Wasn't Lutzka a patent application case? It was a patent application, and I believe so was Young. I don't think that makes a difference, Your Honor, as to whether or not the activity that we are dealing with on behalf of the first user was the filing of a patent application or was in fact commercialization. The truth is in this instance we have both. We have Steele case timing the filing of their own patent application to May 31, 1991, just prior to the Neocon show, which occurred in June. And that in spite of the fact that they knew because Mr. Ambrose of FlexRest had approached them in March and said, I have an idea, I have a pending patent application on file, I in fact have begun selling a product, and I think it would fit in your line and begin exploring licensing talks with them. Suppose there were an unreasonable delay in filing a patent application, but at the same time there was disclosure through a perfectly reasonable course of commercialization such that by the time the good was brought to the state in which it was prepared for commercial exploitation that nothing had been done that would count as an undue delay. Would it be sufficient to satisfy the requirements of disclosure under 102G under those circumstances? My answer, I think, lies in the concurring opinion of Judge Rich and Young versus Dworkin. This court has consistently, as I read the cases, refused to say there's any magic time period involved. As Judge Rich said in Young versus Dworkin, it is the totality of the conduct and the intent that is relevant, not so much the lapse of time. And here the clear issue is that the totality of the conduct was, as even mentioned by counsel for Steele Case in their opening statement, of course we kept it secret. You keep the Emmys and the Grammys secret before the show. And that's our point exactly. Now there's only a seven-month time period here, but it's that seven-month time period where there was active suppression and concealment, timing everything to make sure that it only occurred exactly at the Neocon show. And it was exactly in the middle of that time frame that Mr. Ambrose, both conceived of his invention in November of 1990, reduced his invention to practice, filed a patent application, and began sales, and then contacted Steele Case. And to show that there clearly were their intent of not telling anybody about what they were doing, even when Mr. Ambrose went to them in the middle of this time frame and said, I have an idea for you, and he gave them paperwork on it, and he gave them pictures of it, they still didn't say anything about what they were doing. Well, of course, if they were diligent in either prosecuting the patent or diligent in commercializing the product, the fact that they did not otherwise disclose what they were working on wouldn't be enough to trigger the exception in 102G, correct? I think that's right, but I don't think you can be diligent if your intent is to suppress and conceal. I don't understand that. Typically, if you're working, for example, on a patent, you're not going to be disclosing it to the world, you're not going to be issuing it as an article, typically, and you work on your patent quietly until you're ready to file it, and indeed the filing even doesn't get brooded about. Why is that? Assuming it's all proceeding as fast as you can, the fact that you don't disclose it doesn't trigger 102G at all. What triggers 102G is that there are acts of keeping it secret in the context of acts of keeping it secret, this means suppressing it from public knowledge. And that can happen over a short period of time or a long period of time, it does not matter. Well, suppose, let's be concrete about this. Suppose I have an idea, I go to my patent lawyer as quickly as I can, the day after conception and reduction to practice, and I say to my patent lawyer, file this as fast as you can. I know it takes a while to carefully draft the claims and so forth, but move as expeditiously as you can, I don't want any delay here, but in the meantime, don't you or anybody else in your firm disclose anything about this to anyone? 102G? Not necessarily. Not necessarily? I don't think so. Not at all? I don't disagree with that. It's a matter of law. I don't disagree with that. So the suppression, the concealment, the non-disclosure isn't a problem in that setting as long as there's diligent progress towards disclosure, right? And as long as there is no active pro-action on behalf of the patentee to say, we are not under any circumstances, no matter whether the patent application is ready, no matter whether we get some intervening person along the line, under any circumstances are we going to file this before Dadex. That is not going to happen. In other words, I mean, as I'm understanding from the briefs at least, maybe in part in response to Judge Bryson's question, is you can't have established that you were proceeding diligently when what was driving this was not how long it was going to take to get to an end point, but the state of commercialization, the state of the neo-com thing. Yes. So you're saying that the existence of that and the assumption that that was going to be the date no matter when they were ready should be sufficient to at least question whether or not there was diligence getting there? Yes. Am I understanding this? Yes, and we have evidence that when their patent application was drafted in March of 1990 and presented to the inventors that they did almost nothing to it. It was ready then, and as they saw it in March, for all practical purposes, and I'm talking 98 percent, was what was filed the day before the account showed. Well, wait, but you're talking, on the patent application, you're talking about a lag between March and May, between the time it was sent to the inventors, and then in May they filed the application, right? Yes, but they already had reduced this invention to practice as of November 1990. I mean, there are two types, there are two elements of conduct that are occurring here, Your Honor. One is the progress towards the filing of a patent application, and the other is progress towards commercialization. And we submit that both of those were timed deliberately and carefully so that they were just finished just prior to the neo-con show. And it is not so much how much time lapsed, as Judge Rich has said in the Young v. Borken case, as it is the totality of the conduct, was in effect their conduct delaying the public disclosure of this, and that's what suppression and secrecy under 102G2 means, and that's the public policy behind it. But in this case, there was diligent activity toward both preparing the application, and, as I understand it, diligent activity toward commercializing this invention. And what do you see in the record that suggests that, despite that reasonable conduct on both the application side and the commercialization side, suggests that this shows active suppression or concealment? The fact that, as every single witness up there has admitted, we were doing this to time it so that it all merged and was done just before the neo-con show. What difference does that make if all the other conduct is reasonable? What difference it makes is that in the interim period, along comes a good-faith inventor who conceals, reduces to practice, files, and makes it public. This could all be explained as simply a matter of, shall we say, caution, even diligence on their part in coordinating both the drafting and filing of a patent application and the commercialization of the product and the disclosure and release of information at this trade show. And, of course, you have in the background, you have considerations of the absolute novelty requirements for foreign filing. And I'm just having difficulty making the jump from conduct which, on its face, in a relatively brief period of time—we're only talking about six or seven months— has all of the trappings of being nothing but reasonable to making this jump to say, this is active suppression and concealment in the sense of 102G. I'm into my rebuttal time, Your Honor. If you could comment, yes. But I think what distinguishes this case from any of the other cases that I have read, I think I've read all of them from this Court that deal with this, is here there are admissions by the people that they were doing this in an attempt to keep it secret and to keep it away from the public until a defined, distinguished date. But companies do that all the time simply to protect their interests, not necessarily to suppress prior art or to suppress an invention. Companies progress orderly all the time from a first unit down to the point where they either commercialize or they file an application, but not necessarily with any intent of timing when they will do it and making sure that there is deliberate denial of the public until a date acts. I think that was the distinguishing factor. Thank you. Very well. We will give you two minutes of rebuttal time. Why don't we hear from Mr. Zinniak. May it please the Court. Mr. Cease has repeatedly stated that there was something other than maintaining the confidentiality of the production process and the patent preparation. In fact, nothing in the record suggests that it was anything other than normal, well, we're not going to go and tell the world about what we're filing a patent on or what we're going to disclose. There was no, any particular suppression or concealment. What difference does that make? I know that our cases have distinguished between a kind of implied suppression and express suppression, but I have been thinking about it. I was hard-pressed to see why it should make a difference, for example, in a case such as this one, whether the company simply did not disclose information about their pending patent, let's say, as opposed to one in which the company had an express policy saying don't disclose pending patent work. I don't think there is any distinction. To me, so long as there is a public disclosure within a reasonable period of time, that's the end. The statute is very simple. It just says the first inventor gets priority unless that first inventor has, quote, abandoned, suppressed, or concealed, unquote. If you have a public disclosure within a reasonable time, however that disclosure is made, that's the end of the story. Isn't a reasonable time based on various facts and circumstances? It is. I mean, there's no rule three months is not enough and eight months over. That's correct. And so why isn't that? I mean, I understand the question. It's a question of law, the ultimate question of whether or not there was suppression or concealment. But why isn't that a matter that should have gone to the jury to determine the reasonableness or the facts, you know, the inferences to be taken from the facts and circumstances given? It's a question whether it should ever go to a jury under any circumstances. As the Pollack case by this court in Bonk has held, whether something is suppressed or concealed is dependent on the public policy of the statute. That case, I think we can all agree, doesn't hold that this is not a jury question. You're really stretching, I think, from the public policy that is based on principles of equity to say that this is not a jury issue. And indeed, although neither I nor I take it Mr. Cease could find a case from this court which specifically held that this issue is a jury issue, we've certainly had many cases in which it has been submitted to a jury and in which we have effectively said the jury correctly or incorrectly adjudicated this issue. I think you have a real uphill battle to try to persuade us that that in-bank case, which doesn't hold anything about whether it's a jury question or not, should be read to say that this is not a jury question when it is, as Judge Prost said, so heavily factual in its nature. I'll continue with the other argument, which is— Do you have anything else? Is that it? Your in-bank case proposition that doesn't really do it? If you are talking about equitable issues, equitable issues have normally, such as in equitable conduct, have been held triable to the court rather than to a jury. In this case, in any event, there are no disputed issues. The facts are that, yes, there was a reduction to practice in November 16, and there was a public disclosure within seven months. The disclosure was at a once-a-year international trade show, which is the place where anyone who has any new product tries to display it. You mean there are no disputes about the historical facts? That's correct. But that doesn't take a case away from a jury, right? If you have a negligence case, it may be that no one disagrees about what happened at the intersection where the accident occurred, but it's the jury's job to decide, based on its assessment of the historical facts in light of the instructions it's given, as to whether those facts arise to the level of negligence. Isn't that exactly the situation here? No, sir, because there will be certain historical facts under which no court and no reasonable jury could find negligence in this case. Sure, but the fact that there's no disagreement as to the historical facts is not in and of itself enough to take a case away from a jury, correct? Yes, but what we're saying is that, first of all, there are no triable facts. And given the undisputed facts, everything is controlled by this court's precedent. This court's precedent in both the Checkpoint case and the Dow Chemical cases have been very clear that, respectively, four years and three years of time taken between reduction to practice and commercialization is not abandoned suppression or concealment. You cannot square those two holdings with any possibility of giving a case to a jury to suggest that a seven months of diligent effort toward commercialization can constitute abandonment suppression or concealment. Now, those cases said, if I recall correctly, correct me if I'm wrong, but that four years or three years was not, as a matter of law, concealment. That's correct. Which is quite different from saying that anything less than four or three years, as a matter of law, is not concealment. That's right, but I think it's up to the jury. So to say that, well, there you are, three or four years is the line, that's just not correct, right? Well, it certainly says that, in those cases, what the courts held was that up to four years of diligent efforts toward commercialization negates suppression or concealment. But you're not arguing that as a matter of law. You're simply saying that if a jury had found that that wasn't suppression, that the appellate court wouldn't overturn that jury's finding as a matter of law. That's all those cases stand for. I would like to see how a jury on these facts could make a determination under the law that the seven months of undisputed diligence constituted suppression or concealment. You're asking, you're permitting the jury to find something that, as a matter of law, cannot be a correct result. There's no precedent at all in any of this court's or the predecessor court's decisions that would suggest that seven months of diligent effort can constitute suppression or concealment. When you have cases that say three or four years of diligent effort, it does not constitute abandonment or concealment. How can seven months be? But you're suggesting that there's no dispute as to whether or not there was reasonable diligent effort from November till June? And isn't that a matter that, I mean, the other side is disputing? That was never disputed, Your Honor. There was never any dispute that the effort was diligent. The efforts were stated, that there was no cross-examination. The tooling, the tooling to get a product that had the features, you know, that had the aesthetics and everything else that could be done, some of that tooling took 24 weeks. That's six months. Mr. Ambrose, the inventor himself, testified that he thought six months to a year was a reasonable period, and that's cited in our brief. Mr. Kozuniak, could you comment a bit about your position on inequitable conduct? Yes, Your Honor. It is, Your Honor, somewhat unusual to ask this court to reverse the decision of the trial court on inequitable conduct. But this court has done it before. Finding inequitable conduct is a matter of law, even where the district court has found no inequitable conduct. What are the best authorities for that proposition, where this court has actually directed the entry of judgment of inequitable conduct over a trial judge's finding of no inequitable conduct? I would cite, Your Honor, Pritikin v. Becton Dickinson, 120 F. 3rd, 1253, Federal Circuit, 1997. Anything else that you found in your research? That's right, Your Honor. It's certainly, I think, the best case. Any other not-so-good cases that still support you? Off the top of my head, I cannot recall another case where there has been an actual entry of judgment, as opposed to suddenly a battle to the court. But the reason that the court should act in this fashion in this case is, again, the record doesn't show any dispute as to any material facts. What happened is fairly well clear. There are certain inferences from the facts, but those inferences are not really issues of credibility. This is a case where everything was done by an attorney. We're not saying the inventor or someone else knew something and did not do something. Everyone says it was the attorney's decision. You, I take it, had a deposition from Mr. Fox, the attorney in question, which you introduced at trial. You didn't call Mr. Fox, was that because— We could not call him because— Outside of the jurisdiction. Outside the jurisdiction. Did you try to subpoena him? Well, we— Was it just clear that he wasn't going to sign the subpoena? It was clear that he was not going to show up. All right, fair enough. And we couldn't subpoena him if the other side wanted to bring him in. Obviously, I'm sure he would have, but— This all centers around the failure to disclose this Jones letter and the attached photographs. That's correct, Your Honor. Now, is that information—is it your position that that information is material? Your Honor, I think it is the highest form of materiality because what that letter showed, and not so much the letter but the photographs that were attached to the letter— And the letter, I mean, you could characterize the letter as attorney argument. It's not evidence. That's correct, but— And the photographs were not dated. That's correct, Your Honor. What the photo—what Mr. Jones said in that letter is these are photographs of something that was on sale in 1989. Now, that's his argument. Why is that material? Let's suppose that, hypothetically now—this is not this case—but hypothetically, let's suppose that there was no Seiler patent, and the only information that came to light was the Jones letter and the photographs. Did Mr. Prox have a duty to disclose that information? Absolutely, because the fact that it's a letter and photographs does not change the fact that this is prior art. Well, that's the question. Well, it is photographs of the prior art. It is no different than, for example, a brochure. In fact, that information was disclosed by different counsel in the 231 file. That's correct. That counsel saw it and said, I'd better disclose it. And he disclosed it, made no representation as to the veracity of the information, and the examiner even questioned counsel, you know, did you follow up? Did you examine this equipment? And the response, as I understand it, is that, no, we didn't follow up. We make no representations one way or the other. We make no admissions. You know what I know. Take it from there. And the patent office dropped it. In that case, that particular examiner dropped it, and the claims were different than the claims in the 489 patent. In the 489 patent, what was shown in those photographs was anticipatory. It is the highest form of materiality. If you say, well, this was a representation by another attorney that this was a picture of prior art, and the attorney says, well, I didn't believe it. That is what he said. Yeah, I didn't believe it. But there was no objective basis for him not to believe it. The product was offered for his inspection. Well, he says he had an objective basis not to believe it because this was an argument from an attorney representing a party who had been charged with infringing or potentially infringing this patent. No, that's not correct, Your Honor. The other party was in licensing negotiations. They were going to – they weren't doing anything yet. They were going to take a license under these patents. Penny and Edmonds was asked to make an investigation, did an investigation, and told the potential licensee, don't take a license under this patent. Nonetheless, it's a potential advert party. Where would you normally expect to find prior art? You would expect someone with an interest in the matter to investigate the history and the prior art, and if a piece of prior art is presented to you, it is presented. Yeah, but you might well expect that that person would be presenting something in the spirit of advocacy where the interest of their client was to say that your patent is valueless, I don't have to take a license. Well, what if the other attorney presented a brochure, a brochure that had a date on it? Therein lies the distinction. And I would say, why would that be any different? Well, it would be different because it has evidentiary weight, and similarly, the attorney could have submitted an affidavit from somebody to verify the photographs. How do we know that that machine represented or argued in the letter wasn't built the day before the letter was sent? The decision by Mr. Fox should have been to disclose the information unless he had clear evidence of some sort that what was represented to him was not true or was incorrect. Let me turn the question just a little bit, not to interrupt, but let's suppose Mr. Fox had submitted this information, just as it was done in the other patent by different counsel, and the examiner in that case questioned the evidence. Did you go verify it? Did you have a date? And let's suppose that Mr. Fox had made the same statement, you now know everything I know, and I'm not making any admissions. It is what it is. What is the examiner to do with that? Would the examiner have properly rejected a claim on the basis of that information? I believe that the examiner could have because an examiner can accept hearsay information in the course of a prosecution. Moreover, even if the examiner chose not to pursue it and said, okay, well, I don't have enough information to convince me, that information would have been in the file so that a third party, a member of the public who was faced with that patent, already had the necessary information to determine whether or not they should be taking a license under the patent or respecting the patent to avoid infringement or deciding to challenge the validity of the patent. That information in the public record is relevant not only for the purposes of the examination, but it is relevant and material in the sense that it creates a body of information that can be utilized. Is that the standard of materiality under Rule 56? The rule is that materiality is what would be considered important by an examiner. And in this case, I think it would be considered important by an examiner as evidenced by what happened in the other case. The examiner in the other case didn't ignore the information. He asked for more information and then decided in that case not to pursue it. But again, it was a different set of claims. Really different. The ergo device, which is the depicted device in the photograph that we've been talking about, I take it, that was introduced at trial as itself prior art, correct? Setting aside the inequitable conduct issue. And what was the argument that was made as to why that was not anticipating prior art? Because the court had construed, I'm sorry, the 489 claims required a clamp. And that ergo prior art had a flat, sticky surface, did not have a clamp. It was therefore utilized in combination with other elements to show obviousness. And the jury did find obviousness. So, but in the prosecution, you have to give claims their broadest scope. That's in Rule 56 and in other rules. And in this case, counsel for Ambrose had argued that a flat surface, i.e. exactly what is in the ergo device, did constitute a clamp. That was the request they had made during the claim construction hearing. The Judge McKee did not agree with them, but the argument was made that… Lucky for them. As it turns out. As it was. Because otherwise, if Ambrose, I'm sorry, Fluxrust had won its Markman construction, then that device would have been anticipatory. But more importantly, Mr. Fox, and this is cited in our brief, Mr. Fox believed that a flat surface did constitute a clamp. So he, looking at that photograph, saw an anticipatory prior art, assuming it was prior art. And he had no reason to believe that it was not prior art. Very well. Why don't we hear from Mr. Cease, and we will reserve, I will restore, your rebuttal time. Mr. Cease, then, Mr. Neal, if you could add an extra five minutes to Mr. Cease's time. Mr. Cease. Thank you, Your Honor. Let me address the inequitable conduct issue first. I think there is no better answer as to why there is no inequitable conduct in Judge McKee's March 23, 2005, opinion. There were three assertions of inequitable conduct made by Steelcase. One was the photographs and the Harry Jones letter. The second was they said it was inequitable conduct not to disclose the KBS when Mr. Ambrose found out about the KBS at the Neocon show and was in the middle of prosecution of his application. And the third was he said he filed a false declaration in his petition to make special the refiled application. What Mr. Fox did, I think, needs to be viewed in the light of what Mr. Fox did. Mr. Fox was called, asked to go along with Mr. Ambrose to a meeting at the Boston Logan Airport and discuss what they believed was going to be the final signing of a license agreement with Webernet. Instead, what they were confronted with was the Penny Edmonds letter, told about the Siler patent, and presented this letter. Actually, the letter wasn't presented at that time. They went home and then they confirmed the meeting, sent the letter, sent the photographs days afterwards. No dates on the photographs. The letter was sent by somebody who obviously had a biased position, namely we don't want our client to have to pay any money and take a license. And so he had a right to challenge the credibility of it, recognizing that it was coming from a biased person. And Judge McKeague distinguished, there's no citation of the case that Mr. Zuniak gave you, Crittenden, I believe, in his briefing. The case he relied upon was Brasileir. The case he relied upon at the district court level and he relied upon here. And Judge McKeague distinguished Brasileir very nicely saying, in that case, you have a senior lawyer at the company, in effect, being in cahoots with the client, both of them knowing that a prior public use had occurred, and so they assigned the drafting of a patent application to a junior lawyer, telling him he's got three days to beat a bar date, and that's why he's got to file in a hurry.  Everything turned south and ultimately there was inequitable conduct. And what Judge McKeague said was a singularly distinguishing feature from that Brasileir case about the information was that the lawyer here had total access to the information from his own client. All he had to do was to talk to his client, the people that he was dealing with in the house, and they could have known all the necessary facts about the prior public use. And here, we did not only not have access to the information from our own client, in fact, we had skepticism about whether the information was really accurate. You know, that information was received, that letter was received in, when was it, May of 96? Yes. And then a few months later, in October, there was an information disclosure statement submitted. Yes. And at the same time, there was a petition to make special. Yes. And the information disclosure statement, for the first time, made this Seiler patent of record. Yes, and I think it's important to note what Mr. Fox did. He had a loud case when he went to that Boston airport and talked to those folks. And when he found out about the Seiler patent, he went back, refiled, opened his record, and put the Seiler patent in the record. So he obviously recognized this was important enough to bring to the attention of the Patent Office, at least insofar as the Seiler patent was concerned. Yes, and Mr. Seiler himself, Your Honor, testified that the patent taught more than the photographs did. Well, but here's the concern I have, because the representation made to the Patent Office in the information disclosure statement is that Seiler shows a keyboard platform always positioned in a positive tilt. It appears to have some limit switches, and the configuration of the gearing always positions the keyboard in a positive tilt. There is no teaching of positioning the keyboard in a negative tilt position, but yet you have this photograph that was attached to the Jones letter that shows the keyboard in exactly the negative tilt that was the subject of the claims of this patent. So you have information which is hardly cumulative. It's directly contradictory to the statements that were made. And doesn't that make that at least a matter of interest for the examiner? Well, the testimony of Mr. Fox was that he and Mr. Ambrose had studied the Seiler reference, and that they believed that as it was moving up and down, that it was always maintained in the level position. That they'd gone through the mechanics of it, and that is what they believed. His testimony about the photographs was that he was highly doubtful about their credibility and about the machine and whether it had been altered or nothing. He knew nothing about it, and for that reason, he simply did not disclose it. If you read the Seiler reference, there are figures there that show movement in a clockwise and counterclockwise direction for the keyboard, and it discloses these limit switches. But there's nothing that clearly, one way or the other, says that it only moves in a horizontal or positive position. And I understand from an advocate's point of view, that was the posture that Mr. Fox wanted to take. But you have these photographs that seem to directly contradict that position. Don't you think the examiner might have taken a little different look at the Seiler reference if that information in the Jones letter and the photographs had been shared with him? Well, what I can say is that he gave him the Seiler reference. The examiner had the Seiler reference to interpret as he or she wished. Mr. Fox, I believe, told them what he thought was the truth about the Seiler reference. And I might remind the court that Judge McKee said that there was no evidence that he could conclude gave rise to intent to deceive based upon the conduct of Mr. Fox. Perhaps negligent, but certainly no intent to deceive. I have read the Fox deposition, and it's true, as you say, that Mr. Fox defended in substantial measure on the ground that he just didn't regard the photographs as credible. But he doesn't really say much about why he reached that conclusion. And I'd be interested in whether there's any basis, other than the fact that it happens to have come from somebody that was engaged in licensing negotiations. And therefore, to that extent, perhaps matters partly. But there was a representation by reputable lawyers that this photograph depicted something that was in existence prior to the priority date of the patent. So it's not clear to me wherein he got his skepticism about the photograph. I believe that his testimony was that his skepticism came from he thought they were being set up at the Logan Airport meeting, so to speak, by a biased group of individuals. And the photographs had no dates on them. There was no authentication on the photographs as to whether that was the device that existed at an earlier period of time or whether it was a device that had been altered in the time of his death. Well, there was a representation by the lawyers that that was so. There was. So he's basically saying, I believe these lawyers were lying to me. But on what ground? We don't ordinarily assume one of our fellow counsel is lying unless we have no basis whatsoever. I believe that his testimony for his reason was simply that it was from a biased person who he believed didn't want to pay any money under a license. That's what I think the record establishes. The petition to make special represented that he had conducted a thorough search. Does that place an obligation on him to take the step to check out this information received in the Jones letter to determine definitively whether it was or was not accurate? Well, that is going farther than a search. That's that's almost a detective like investigation. And that's that's a different concept than the standard water plate language that says in a petition to make special. Well, if you if you do a search and you find a piece of literature in a library that looks like it's a dead ringer, but the date is obscured. Is that enough to just say, well, it's got no date on it, so don't don't have to worry about that. And you represent under oath to the patent office in order to to have the patent application considered special that you conducted a careful and thorough search. Don't you have some obligation to to find that date? What gives rise to a duty to investigate for a prosecuting attorney is is best, I think, fuzzily defined by the cases as to when you have sufficient information and access to sufficient information that you have to go that extra step. I don't think that there is sufficient information that was here given the circumstance under which he got the letter. I think as Judge McKee distinguished the Brasler case, I think he was correct. Let me ask this question and let me put it in a slightly different way. But I think it's the same question. You're an experienced patent lawyer. If a junior associate in your firm came to you and had this exact case and was holding that letter and that photograph and said, Mr. Seitz, I just received this. We have an application pending. Should I disclose this to the patent office? What would you tell that associate to do? I would tell him exactly what I told the class I teach at Drake University. Disclose all. OK. Why take a chance? Disclose all. But, of course, you would add that that doesn't mean that the failure to disclose has the consequences that you're pointing out. Exactly. I want to mention one thing and then I will sit down. I think it's critically important to the entire analysis of this and the consequences of the KBS to note that in the inequitable conduct proceeding after the trial is over, in response to the question about whether he should have disclosed the KBS, Judge McKee said KBS is not prior at all. Well, if the KBS is not prior at all, the KBS should not have been in presence of the jury. It was information kept secret, information that Mr. Ambrose had no access to, information that the public had no access to. And that kind of information has to be extraordinary circumstances in order for that to be prior to any litigation. Thank you. Very well. Thank you. Mr. Pazini. If I, if I may. This is limited just to the cross appeal. If I may, just to follow up on the court's questions about another case, I perhaps should cite another decision. And that is the Bruno Independent Living Aids versus Acorn case, 394 F. 3rd, 1348 at 1354. Although it's not directly relevant to the court's question, in that case, this court, that was in the course of discussing the finding of intent, said as follows. The particular facts and circumstances of the present case correspond in all relevant aspects to those cases in which we have upheld inferential findings of deceptive intent on similar key evidence, unquote. So in that case, this court was saying, yes, we can infer intent to deceive because if you look at the facts, they correspond completely to the types of facts on which we have found or inferred inequitable intent in the past. And that is exactly, I think, this case. If you look at the objective facts, just the plain objective facts, the very issues Your Honor has, Your Honors have picked up in the questions, you have to say on what possible basis could anyone legitimately have withheld those photographs under potential prior harm. In this case, in fact, it's worse than in most other cases because there was a petition to make special and a declaration by the attorney. That attorney declaration said clearly and unequivocally, I have conducted a prior art search. With that declaration, he submitted the Seiler patent and all the other pieces of prior art that were in the IDS. In effect, he was telling the patent office, hey, don't bother doing anything else. Here's my oath. Here's my representation that I have done the prior art search. Here's all the prior art. Now grant the petition to make special, which was granted. Once the attorney made that representation that I have done a search of the prior art, he is no longer in a position to simply take a piece of prior art or potential prior art, the photographs in this case, and simply say, I don't believe it. He has now represented that he has made an investigation and he either has to make an investigation or make a disclosure, but he cannot do either. That is why we cited the Brasovir case because it did stand for the proposition that in certain circumstances, yes, you are under an obligation to conduct a further search. Obviously, the facts in Brasovir are different and we never said they were identical, but the proposition in Brasovir remains valid even today, which is you have to, if you, under certain circumstances, you have to make an investigation. In this case, when the attorney said he made an investigation and he did not, then that was, he lied, a plain-out lie to the patent office, in addition to just withholding that piece of prior art. And if we accept that the attorney... Well, I guess that really is a lie is a strong word, and I think that it depends on the scope of what you conceived as the responsibility to investigate. If this had been, if somebody had said at the airport, and oh, by the way, we have machines that do this sort of thing, I wonder whether you would be arguing, well, there you are. Somebody had made a passing reference orally, and therefore his failure to pursue that constituted, made his representation to the patent office a lie. I don't think he would. No, maybe it's a little too strong a word, but I don't think it's far from the truth, because if you are representing that you are, you have made an investigation, with that representation to the patent office comes certain baggage. And that baggage is that you do have to accept your own words as the governing condom, and in this case, what you have is an attorney who has, from a reputable source, a clear indication of prior art, and simply does not ask any more questions, does not accept the invitation to inspect the device or to send his inventors over to inspect the device, just suppresses that information. And if we accept that as the relevant standard, that someone can simply avoid prior art because subjectively, subjectively, without any objective basis, but subjectively only, he did not believe it, I think we have set then the standard for attorney's conduct before the PTO far, far too low, because anyone could be able to say that, well, I didn't believe this, I didn't believe that. Very well, I think we've run well with our time. Let me ask you one procedural question, just in terms of the posture of your cross-appeal. Well, I won't assume, I'll just ask. This is not a conditional cross-appeal, I take it this is a cross-appeal which you would press regardless of the disposition of the main appeal. Is that correct? Thank you. Case is submitted. Thank both counsels.